# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

BRIAN MORRILL,

        Plaintiff,

        v.

KIRSTJEN NIELSEN, Secretary of
Homeland Security,[1]

        Defendant.

Case No. 17-cv-3419

Judge John Robert Blakey

## MEMORANDUM OPINION AND ORDER

Plaintiff Brian Morrill sued his employer, the Department of Homeland Security (DHS), for alleged discrimination and retaliation in violation of the Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 621 *et seq.* [1]. Defendant moved for summary judgment. [24]. For the reasons explained below, this Court grants Defendant's motion.

## I. Background

### A. Local Rule 56.1

The following facts come primarily from Defendant's Local Rule 56.1 statement of undisputed material facts [26] and Plaintiff's statement of additional facts [33]. The parties agree on many of the relevant facts. Plaintiff, however, unsuccessfully attempts to dispute some of Defendant's statements of fact.

This Court has "broad discretion" to enforce the local rules. *Benuzzi v. Bd. of Educ. of Chi.*, 647 F.3d 652, 655 (7th Cir. 2011). The local rules governing summary

---

[1] Kirstjen Nielsen is now the Secretary of Homeland Security and has been substituted as a party with respect to Plaintiff's claims pursuant to Federal Rule of Civil Procedure 25(d).

judgment motions demand that the non-moving party's responses to the moving party's statements of fact contain "specific references" to record evidence to justify any denial.  Local R. 56.1(b)(3); *see also Malec v. Sanford*, 191 F.R.D. 581, 584 (N.D. Ill. 2000).  Thus, purely argumentative denials, legal conclusions, and unsupported general denials do not belong in Local Rule 56.1 statements.  *See Phillips v. Quality Terminal Servs., LLC*, 855 F. Supp. 2d 764, 771 (N.D. Ill. 2012); *Malec*, 191 F.R.D. at 584.  District courts may disregard improper denials and deem the opponent's factual allegations admitted.  *See Aberman v. Bd. of Educ. of Chi.*, 242 F. Supp. 3d 672, 677 (N.D. Ill. 2017).

Accordingly, this Court disregards Plaintiff's responses to the following paragraphs of Defendant's statement of facts: 28, 35, 36, and 37.  His responses cite portions of the record that fail to refute the statements of fact.  *See Malec*, 191 F.R.D. at 584.  Defendant's corresponding statements of fact are deemed admitted. *Aberman*, 242 F. Supp. 3d at 677.

## B.    Plaintiff's Employment

Plaintiff works as an emergency management specialist/program analyst at the Federal Emergency Management Agency (FEMA), a sub-agency of DHS.  [26] ¶ 3–4.  Plaintiff turned 40 in June 2013.  *Id.* ¶ 3; [26-2] at 15.  Plaintiff works in FEMA's Region V, headquartered in Chicago, Illinois.  [26] ¶¶ 4, 10.  At all times relevant to this case, Plaintiff worked at Region V, in the response division of the planning branch, under the same two supervisors: Gustav Wulfkuhle, the planning branch chief and Plaintiff's direct supervisor, and Paul Preusse, the response division director.  *Id.* ¶ 10.  Preusse, in turn, reports to Janet Odeshoo, the deputy

regional administrator.  *Id*.  Through 2015, Odeshoo reported to Andrew Velasquez III, the regional administrator.  *Id*.

Plaintiff began working for FEMA in September 2010 as a program analyst at the GS-11/12 pay grade.  *Id*. ¶¶ 6–7.  Being hired at that designation meant that if Plaintiff performed satisfactorily for one year, he would automatically advance to the GS-12 pay grade.  *Id*. ¶ 7.  In 2011, Plaintiff advanced to GS-12, step 1; in 2012 to GS-12, step 2; in 2013 to GS-12, step 3; and in 2014, to GS-12, step 4.  *Id*.

As a program analyst, Plaintiff managed and coordinated responses to disasters, emergencies, hazards, and various types of crises.  *Id*. ¶ 8.  From the time he started at FEMA, Plaintiff has worked on the New Madrid Planning Project, a large, complex project planning out a regional earthquake response.  *Id*. ¶ 9.  At his deposition, Plaintiff described New Madrid as FEMA's "largest project ever."  [26-2] at 10.  Plaintiff has also worked on planning initiatives to address pandemics and power outages.  [26] ¶ 9.

FEMA awards discretionary year-end bonuses to employees who achieve an annual performance rating of "exceeds expectations" or "achieved excellence."  *Id*. ¶ 12.  These bonuses can take the form of additional pay or time off.  *See id*. ¶ 14; [26-2] at 202.  Performance reviews come from the employee's first-line supervisor, and the regional and deputy regional administrators make the final decision on awarding bonuses.  [26] ¶¶ 12–13.  Plaintiff received an above-standard performance rating and a time-off bonus in 2013.  *Id*. ¶ 14.  From 2014 to 2016, Plaintiff received an "achieved expectations" rating, and therefore did not qualify

for a year-end bonus. *Id*. Wulfkuhle, as Plaintiff's direct supervisor, reviewed Plaintiff's performance during this period. *See id*. ¶¶ 10, 12; [33] ¶ 24.

## C. IMAT

FEMA runs a regional Incident Management Assistance Team (IMAT) comprised of various emergency management employees who deploy in teams to disaster sites. [26] ¶ 15. Before 2013, IMAT had a dedicated, full-time staff; following a restructuring, FEMA decided to staff IMAT with temporary employees from across other departments. *Id*. In facilitating this transition, FEMA had to offer all former full-time IMAT employees new, permanent positions in FEMA and seek volunteers from other departments. *See id*. ¶¶ 15–16.

In mid-2013, Preusse asked Plaintiff to volunteer for IMAT. *Id*. ¶ 27. Plaintiff considered this a "collateral duty" rather than a requirement for his position. *Id*.; [26-2] at 17. Preusse attests that he asked Plaintiff to volunteer because IMAT needed someone with his skill-set and Plaintiff had no other "substantive collateral duties at the time." [26-2] at 145. Plaintiff testified that he agreed to be on IMAT because his conversation with Preusse suggested that volunteering would help his promotion to the GS-13 level. *See* [26-2] at 15, 17. In a November 2013 email, and in a declaration submitted with his response, Plaintiff declared that he felt "pressured into" volunteering. [26-2] at 239; [33-1] at 2.

In November 2013, Plaintiff was asked to deploy with IMAT and emailed Wulfkuhle asking to be excused. [26] ¶ 28; [26-2] at 239. According to Plaintiff, when he asked to be removed from IMAT Preusse told him, "you know what this is going to do to you," which Plaintiff interpreted to mean that leaving IMAT would

harm his chances of a promotion to GS-13. [26-2] at 18. Around roughly the same time, and possibly in 2012 and 2014, Plaintiff repeatedly complained to Preusse and Wulfkuhle about the merit selection system in place in his division—specifically mentioning his lack of advancement and the division's failure to fill vacant positions in the planning branch. *See id*. at 18–19. Plaintiff believed Preusse's implied threat also stemmed from his resentment of Plaintiff's complaints. *See id*.; [33] ¶ 9.

By the end of 2013, Preusse granted Plaintiff's request to be removed from IMAT. [26] ¶ 30. Plaintiff never deployed to a disaster site while assigned to IMAT. *Id*. ¶ 29.

## D. Protected Activity

Eric Phillipson worked with Plaintiff as a program analyst in the response division of the planning branch. *Id*. ¶ 23. In 2013, Phillipson filed an equal employment opportunity (EEO) complaint alleging age discrimination and retaliation. *Id*. In February 2014, Plaintiff submitted a witness affidavit supporting Phillipson's complaint. *Id*. ¶ 24.

Plaintiff submitted the affidavit to Janel Fairchild, an investigator contracted by FEMA for the administrative investigation. *Id*. ¶ 25. Initially, Plaintiff did not share the affidavit with anyone else. *See id*.; [32] ¶ 26. On October 1, 2015, Plaintiff emailed Wulfkuhle to express his ongoing dissatisfaction with his pay grade and responsibilities. *See* [32] ¶ 26; [26-2] at 376–77. In that email—and in a conversation earlier that day—Plaintiff referenced his affidavit in support of Phillipson, as well as his belief that Wulfkuhle's actions relating to Plaintiff's pay and responsibilities constituted retaliation for that affidavit. *See* [26-2] at 376.

There is no evidence that Plaintiff told his supervisors about the affidavit earlier than October 2015. *See* [26] ¶ 26; [32] ¶ 26.

### E.    Alleged Retaliation and Discrimination in 2015

Plaintiff claims that the following incidents from 2015 represented discrimination and/or retaliation on the part of DHS.

In February 2015, Plaintiff left his personal identity verification (PIV) card in his computer while he stepped away from his desk. [26] ¶ 32. This represented a breach of FEMA's IT security policies, which require employees to log off computers whenever they leave their desks and to keep their PIV card on them at all times. *Id.* ¶ 31. An IT employee spotted Plaintiff's unattended PIV card, removed it from his computer, and brought it to the security office. *Id.* ¶ 32. When Plaintiff went to the security office to retrieve his PIV card, he felt that the security employee who had his card—Richard Amburgey—treated him disrespectfully. *Id.* ¶¶ 33–34; [32] ¶ 34. Plaintiff "became more frustrated" and "reached over" and said "just give me my fucking ID." [26] ¶ 34; [26-2] at 43. Plaintiff felt that the IT employee and Amburgey had singled him out: even though leaving his PIV card constituted a security violation, Plaintiff testified that no one else in Region V "ever had their ID pulled from their computer and turned into security except me." [26-2] at 43–44.

That same day, Amburgey completed a "Security Incident" form; Plaintiff also disclosed the incident to Wulfkuhle and apologized to Amburgey. *See* [26] ¶¶ 32, 35–36; [26-2] at 278–79. Wulfkuhle consulted with Preusse and Keith Johnson, an employee relations liaison. [26] ¶ 36. Johnson asked Wulfkuhle to gather information about the incident and various employees who had witnessed the

interaction submitted statements. *Id*. Wulfkuhle sent the statements to Johnson, noting that this was the first such incident involving Plaintiff. *Id*. ¶ 37. In March, Johnson told Wulfkhule to "counsel" Plaintiff about the incident, and Wulfkuhle did so. *Id*. Neither Wulfkuhle nor any other supervisor took any additional action toward Plaintiff, or added the incident to Plaintiff's personnel file. *Id*.

In July 2015, Plaintiff requested a "desk audit"—an assessment of his job duties that he hoped would lead to a reclassification of his position at the GS-13 level rather than GS-12. *See id*. ¶ 38. Maya Scott, a human resources specialist, conducted the audit, for which both Plaintiff and Wulfkuhle completed questionnaires about Plaintiff's work. *Id*. ¶¶ 39–40. In September 2015, Elizabeth Hough, the chief of FEMA's position management and classification branch, issued the results of the desk audit, concluding that Plaintiff had been correctly classified at GS-12. *Id*. ¶ 41. Plaintiff disputed the result and argues that Wulfkuhle's responses to the audit questionnaire were "completely inaccurate" and "purposefully false." *Id*. ¶¶ 42–43; [33] ¶ 18. For example, Plaintiff argues that Wulfkuhle failed to note that Plaintiff's work included interagency coordination and objects to Wulfkuhle's lack of detail in his responses. *See* [33] ¶ 18; [26-2] at 329.

Plaintiff appealed the desk audit findings on September 23, asserting in his appeal that Wulfkuhle's responses constituted misconduct and "an act of reprisal" for Plaintiff's support for Phillipson. [26] ¶ 44; [26-2] at 359–60. Plaintiff directed his appeal to the Office of the Chief Component and Human Capital Officer and the Office of Special Counsel. [26-2] at 359.

On November 3, 2015, Angela McGuirl, a human resources officer, rejected Plaintiff's appeal because, pursuant to FEMA's internal policies, classification determinations are not appealable. [26] ¶ 45; [26-2] at 367. She encouraged Plaintiff to discuss the situation with his supervisor or pursue a grievance through his union's bargained-for process. *See* [26-2] at 367. She also submitted his letter to FEMA's Employee and Labor Relations Branch, insofar as it represented a complaint about Wulfkuhle's conduct. *See id.* at 367–68.

Finally, Plaintiff contests the 2015 appointment of Morgan Geiger to a Region V project that Plaintiff had worked on. *See* [26] ¶¶ 49, 64, 65. At some point that year, Velasquez, the administrator for Region V, agreed to accept Geiger on a one-year detail from DHS' finance office to FEMA's Region V, during which time Geiger's salary would be paid out of FEMA headquarters. *Id.* ¶ 46. Geiger held a GS-15 position at the time. *Id.* Geiger is older than Plaintiff. [26-2] at 59. Velasquez informed Odeshoo and Preusse about the arrangement, and they placed Geiger in the Region V planning branch because it was short-staffed. [26] ¶ 47.

On October 1, Wulfkuhle informed Plaintiff about Geiger's detail and that Geiger would take over the Power Outage Annex project that Plaintiff had been working on. *Id.* ¶ 48; [26-2] at 378. At the time, Plaintiff was working on the Power Outage Annex project, the New Madrid Planning project, and hazards and pandemic planning responsibilities; he testified that this kept him "really busy." [26-2] at 57. Plaintiff objected to losing the Power Outage Annex project because it was a "major" project and he felt Geiger lacked relevant expertise. *Id.* at 58–59.

But Plaintiff remained on New Madrid and the hazards and pandemic planning tasks, and experienced no pay cut. *Id*. at 59. Plaintiff felt that his removal from the Power Outage project constituted retaliation for either: his stated dissatisfaction with the merit selection system in place in Region V; his statement in support of Phillipson; or his complaints about Amburgey and Wulfkuhle following the PIV card incident. *Id*. at 60. He said as much in an email to Wulfkuhle that same day. [26-2] at 376–77. Plaintiff also contends that the New Madrid project did not entail much work in late 2015 since it was not expected to "kick off until 2016," and claims that the shift in his assignments affected his desk audit. *See* [33] ¶ 21.

In addition to these incidents, Plaintiff identifies the alleged pressure placed on him to join IMAT—discussed above—as an example of discrimination and retaliation. [26] ¶¶ 64–65. Plaintiff also claims that his failure to secure a promotion to GS-13 before November 2015 constituted discrimination and retaliation, *see id*., as discussed next.

### F. GS-13 Positions and Promotion

Plaintiff applied for four GS-13 positions between 2013 and 2015—three in FEMA's mitigation division and one in the response division. *Id*. ¶ 50.

In March 2014, FEMA posted a GS-13 program analyst position in Region V's mitigation division. *Id*. ¶ 51. Plaintiff applied for that position, but the HR specialist reviewing applications from FEMA headquarters found that Plaintiff did not meet the minimum qualifications for that position. *Id*. No Region V employee participated in that decision. *Id*. A different FEMA employee, Alex Contreras, was hired for the position. *Id*.

In November 2014, FEMA posted a second open position in the mitigation division. *Id.* ¶ 52. Anna Pudlo, FEMA's Hazard Mitigation Assistance Branch Chief in Region V, submitted a declaration describing her participation in the hiring decision for that position, and stated that Plaintiff did not reach the interview stage of hiring because he lacked sufficient mitigation experience for the position. *Id.*; [26-2] at 155. Another employee with "significant FEMA specific mitigation experience"—Duane Castaldi—was ultimately hired. [26-2] at 155. There is no evidence that Plaintiff's supervisors in the planning branch participated in this decision. *See id.*; [26] ¶ 52; [32] ¶ 52.

In July 2015, FEMA posted a third program analyst position in Region V's mitigation division. [26] ¶ 53. Pudlo also participated in the hiring process for that position, including Plaintiff's interview. *Id.* Pudlo and the rest of the interview panel determined that the candidate selected for that position—Laurie Smith-Kuypers—had more relevant experience and "interviewed well." *Id.*; [26-2] at 155. Plaintiff, by contrast, lacked mitigation and communications experience, and this position incorporated external outreach responsibilities. [26] ¶ 53. Again, the record contains no evidence that Plaintiff's planning branch supervisors participated in this decision.

Finally, in July 2015, FEMA posted two GS-13 program analyst positions in the Region V planning branch. [26] ¶ 54. Ultimately a third such position received funding as well. *Id.* Plaintiff applied for one of these positions, and participated in a first-round phone interview with Wulfkuhle and Lemorris Graham on October 6,

2015. *Id*. ¶ 56. Plaintiff reached the second round of interviews, and participated in an in-person interview with Wulfkuhle, Pruesse, and Odeshoo on October 26. *Id*. At some point, under disputed circumstances, Wulfkuhle asked Plaintiff if he would be willing to assume IMAT responsibilities if he received the promotion to GS-13. *See id*. ¶¶ 57–58; [32] ¶¶ 57–58. Plaintiff felt that this amounted to undue pressure, and that Wulfkuhle and Preusse singled him out with this question as if "looking for an excuse" to avoid promoting him. [32] ¶ 57. Wulfkuhle stated that he asked every interviewee if they would participate in IMAT. [26] ¶ 57.

In any event, Plaintiff received the promotion to the GS-13 program analyst position on November 6, 2015. *Id*. ¶ 60. Preusse, Wulfkuhle, and Odeshoo made the decision to promote Plaintiff. *Id*. ¶ 59. Plaintiff has remained in that position through this litigation. *Id*. ¶ 60.

Overall, Region V did not hire or promote any GS-13 program analysts in the planning branch between mid-2013 and mid-2015—that is, until it received the funding (and garnered a vacancy) leading to the three positions posted in July 2015, one of which ultimately went to Plaintiff. *See id*. ¶¶ 20–22, 55. According to Wulfkuhle and Preusse, Region V and the planning branch specifically did not have funding for additional GS-13 positions before then. *See id*. ¶ 20. Plaintiff concedes that Wulfkuhle did not have the authority to unilaterally create a GS-13 position or promote Plaintiff. *Id*.

## G. Alleged Comparators

Plaintiff identified the following individuals as similarly situated coworkers whom FEMA treated more favorably: James Cullen, Eric Phillipson, Jason Blum,

Jonathan Marsch, Alex Contreras, Duane Castaldi, and Morgan Holloway. *Id.* ¶ 66.

Phillipson was born in 1967, Cullen in 1975, and Marsch in 1978. *Id.* All three worked with Plaintiff in the planning branch, at least by 2013, and held GS-13 positions. *Id.* ¶ 19. Phillipson was placed on paid administrative leave in 2014. *Id.* ¶ 21. Marsch transferred out of the planning branch into the response division in August 2013. *Id.* ¶ 21. Plaintiff testified that Marsch received favorable treatment before his transfer in that Region V supervisors worked to "find a spot" for him in mitigation after he initially intended to take a job in Colorado and expressed dissatisfaction with remaining in the response division. [26-2] at 66. Cullen never had to assume IMAT duties, although Wulfkuhle attested that Cullen held a different "collateral duty" because he was responsible for drafting the response division's quarterly report. *See* [33] ¶ 3; [39-1] at 25.

Blum was born in 1979. [26] ¶ 66. He worked as an IMAT section chief before 2013 and had to be reassigned following the restructuring that eliminated permanent IMAT positions. *See id.* ¶ 17. At that time, Region V's planning branch had a place for another program analyst but lacked the funding. *Id.* FEMA headquarters agreed to place Blum in the planning branch and funded his position with the money set aside for his IMAT duties. *Id.* Blum transferred to the planning branch in March 2013 but continued to work on IMAT duties through 2014, and reported to Steve Johnson, the logistics branch chief and IMAT team lead. *Id.* ¶ 18. Blum's second-line supervisor was Preusse. *Id.* Blum transferred out of the planning branch into the operations integration branch in October 2014. *Id.* ¶ 21.

Contreras and Castaldi received two of the GS-13 positions in mitigation that Plaintiff applied for in 2014. *See id.* ¶ 51; [26-2] at 155. Contreras was born in 1982 and Castaldi in 1981. [26] ¶ 66. Contreras has received various bonuses while at FEMA. [39] ¶ 3.

Holloway was born in 1987 and at all relevant times worked in the mitigation division. [26] ¶ 67. She started with Region V as a paid intern, then held a GS-11 position in 2013, and then a GS-12 position through 2015. *Id.*; [39] ¶ 2. During that period, her direct supervisor was Pudlo and her second-line supervisor was Christine Stack, the mitigation division director. *See* [26] ¶ 67; [26-2] at 173.

## H. This Case

Plaintiff initially contacted his EEO counselor on October 1, 2015. [26] ¶ 61; [26-2] at 453. In March 2016, he filed an EEO complaint alleging age discrimination and retaliation based upon his statement in support of Phillipson. [26] ¶ 61; [26-2] at 394. In February 2017, FEMA's Office of Equal Rights notified Plaintiff of his right to sue in federal court. [26] ¶ 62; [26-2] at 501–02.

Plaintiff filed this suit in May 2017. [1]. His complaint alleges that DHS retaliated against him (Count I) and discriminated against him (Count II) in violation of the ADEA.

The incidents that Plaintiff identifies to substantiate these claims consist of:

- FEMA's failure to promote Plaintiff to GS-13 before November 2015;

- Plantiff's lack of year-end bonuses;

- Plaintiff's placement on IMAT and—when Plaintiff asked to be removed from IMAT—Preusse's alleged comment that "you know what this will do to you";

- Plaintiff's alleged "singling out" for leaving his PIV card in his computer unattended;

- Wulfkuhle's allegedly false statements in his responses to Plaintiff's desk audit;

- Plaintiff's removal from the Power Outage Planning project; and

- Preusse's allegedly threatening statements on November 5, 2015.[2]

[26] ¶¶ 64–65.  Plaintiff points to these events in support of both his retaliation and discrimination claims.  *See id.*  This opinion addresses Defendant's motion for summary judgment on both counts.  [24].

## II.  Legal Standard

Summary judgment is proper where there is "no dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A genuine dispute as to any material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The party seeking summary judgment has the burden of establishing that there is no genuine dispute as to any material fact.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

In determining whether a genuine issue of material fact exists, this Court construes all facts and reasonable inferences in the light most favorable to the non-moving party.  *See CTL ex rel. Trebatoski v. Ashland Sch. Dist.*, 743 F.3d 524, 528 (7th Cir. 2014).  The non-moving party has the burden of identifying the evidence

---

[2] Plaintiff referred to this last episode in his response to Defendant's interrogatories.  *See* [26] ¶ 64 (citing [26-2] at 466).  It remains unclear what record evidence Plaintiff offers in support of this final alleged episode, although it appears to refer to the exchange between Plaintiff, Wulfkuhle, and Preusse about Plaintiff's willingness to assume IMAT duties during the interview process for the GS-13 position that Plaintiff ultimately received.  *See id.* ¶¶ 58–60, 64; [33-1] at 3.

creating an issue of fact, *Harney v. Speedway SuperAmerica, LLC*, 526 F.3d 1099, 1104 (7th Cir. 2008), by citing "particular materials in the record," *Olendzki v. Rossi*, 765 F.3d 742, 746 (7th Cir. 2014). The non-moving party must do more than create "some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rather, "there must be evidence on which the jury could reasonably find" for the non-moving party. *Anderson*, 477 U.S. at 252. The moving party is entitled to summary judgment where the non-moving party fails to establish an "essential element" of the case for which that party has the burden of proof. *Celotex Corp.*, 477 U.S. at 323.

## III.   Analysis

Plaintiff asserts claims for retaliation (Count I) and discrimination (Count II) under the ADEA.  [1].[3]  Defendant seeks summary judgment on the grounds that many of Plaintiff's constituent allegations are time-barred, and that Plaintiff fails to prove either claim.  [24].  This Court first addresses the statute of limitations before turning to the merits of Plaintiff's claims.

### A.    Time-Barred Claims

Federal employees must timely raise claims of retaliation or discrimination by contacting an EEO counselor "within 45 days of the date of the matter alleged to be discriminatory or, in the case of personnel action, within 45 days of the effective date of the action." *Lapka v. Chertoff*, 517 F.3d 974, 981 (7th Cir. 2008) (quoting 29

---

[3] At various points in his deposition and other materials submitted in response to Defendant's motion, Plaintiff appears to claim that his supervisors also retaliated against him for complaints he raised about Region V's merit selection system. *See, e.g.*, [26-2] at 60.  Because any such claim has no connection to the alleged age discrimination (and Plaintiff identifies none), those allegations cannot form part of Plaintiff's ADEA claims, and this Court need not address them further.

C.F.R. § 1614.105(a)(1)). Courts bar claims that fail to satisfy the 45-day requirement unless the plaintiff meets the standard for equitable tolling. *Id.*; *see also Miller v. Runyon*, 77 F.3d 189, 191 (7th Cir. 1996). Plaintiffs may also evade the limitations period if their claim constitutes a continuing violation—that is, if it arises from the cumulative effect of a series of wrongful events, one of which falls within the limitations period. *See Lapka*, 517 F.3d at 981–82 (citing *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 117 (2002)).

Both Plaintiff's discrimination and retaliation ADEA claims fall subject to the 45-day requirement. *See* [1]; 29 C.F.R. § 1614.103(a); *see also Galinato v. Donovan*, 524 F. App'x 265, 267 (7th Cir. 2013) (discussing § 1614.103(a)'s limitations period in the context of, among other things, ADEA discrimination and retaliation claims). Plaintiff does not offer any argument or evidence showing that his claim qualifies for equitable tolling or that his allegations constitute a continuing violation, nor does the record suggest that either exception applies here. *See generally* [26]; [33]; [34]. Indeed, Plaintiff fails to respond to Defendant's limitations argument, and thus waives any argument that his challenged claims are timely. *See Johnson v. Gen. Bd. of Pension & Health Benefits of United Methodist Church*, 733 F.3d 722, 729 (7th Cir. 2013) (arguments not made in opposing summary judgment are waived); *Palmer v. Marion County*, 327 F.3d 588, 597–98 (7th Cir. 2003).

Even if Plaintiff had addressed this issue, the undisputed facts show that Plaintiff did not contact his EEO counselor or otherwise pursue his administrative remedies until October 1, 2015. *See* [26] ¶ 61; [26-2] at 453. Accordingly, any of

16

Plaintiff's claims arising before August 17, 2015 are time-barred. *See Lapka*, 517 F.3d at 981. That includes FEMA's failure to promote Plaintiff to GS-13 in 2013 and 2014; Plaintiff's lack of a bonus in 2014; Plaintiff's placement on IMAT in 2013; and the PIV card incident in February and March 2015. These events occurred before the 45-day period. Each also constitutes a "discrete act," and thus—even had Plaintiff argued otherwise—does not constitute a continuing violation that could evade the limitations period. *See Nat'l R.R. Passenger Corp.*, 536 U.S. at 114 (failure to promote and wrongful disciplinary measures constitute discrete acts); *Beamon v. Marshall & Isley Trust Co.*, 411 F.3d 854, 860 (7th Cir. 2005).

This Court will consider Plaintiff's promotion history following August 17, 2015, as well as his failure to receive bonuses in 2015 and 2016, the results of the desk audit (the process for which extended into the fall of 2015), Plaintiff's removal from the Power Outage planning project, and Preusse's allegedly threatening statements around November 2015.

## B. Age Discrimination

The ADEA bars employers from discriminating against their employees on the basis of age. 29 U.S.C. § 623(a); *see, e.g.*, *E.E.O.C. v. Bd. of Regents of Univ. of Wis. Sys.*, 288 F.3d 296, 301 (7th Cir. 2002). This prohibition protects employees over the age of 40. *See* 29 U.S.C. § 631(a).

Before the Seventh Circuit's decision in *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760 (7th Cir. 2016), plaintiffs could demonstrate discrimination using either the direct or indirect methods of proof, *see, e.g.*, *Martino v. MCI Commc'ns Servs., Inc.*, 574 F.3d 447, 452–53 (7th Cir. 2009). The former method required direct or

circumstantial evidence that the employer's challenged act was motivated by age. *See id.* at 452. The latter method required plaintiffs to establish a prima facie case of discrimination by showing that: (1) the plaintiff belonged to a protected class; (2) his or her performance met the employer's legitimate expectations; (3) the plaintiff was subjected to an adverse employment action; and (4) the employer treated younger, similarly situated employees more favorably. *See id.* at 453. If the plaintiff established a prima facie case, courts followed the burden-shifting framework set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973): the employer assumed the burden of proving a "legitimate, nondiscriminatory reason" for their challenged action, after which the employee had to show that the proffered reason was pretextual in order to prevail. *Pitasi v. Gartner Grp., Inc.*, 184 F.3d 709, 716 (7th Cir. 1999) (internal quotation marks omitted). Under either method, plaintiffs had to show that age provided the determining factor for the employer's act. *See Gross v. FBL Fin. Servs. Inc.*, 557 U.S. 167, 180 (2009).

With *Ortiz*, however, the Seventh Circuit adjusted its requirements for establishing a prima facie case. *See* 834 F.3d 760, 763–65. Although *McDonnell Douglas* provides the overall burden-shifting framework for employment discrimination claims, *see* 411 U.S. at 802–04, appellate courts retain some discretion to specify the means of proof, *see, e.g., Lindsay v. Yates*, 578 F.3d 407, 415–16 (6th Cir. 2009) (discussing variations in the *McDonnell Douglas* prima facie case depending on the type of claim asserted); *O'Connor v. Consol. Coin Caterers Corp.*, 517 U.S. 308, 311–12 (1996) (holding that the Fourth Circuit test for a prima

facie ADEA case wrongly excluded relevant evidence). Thus, the Seventh Circuit permissibly overturned its own precedent when it reshaped the inquiry as to a plaintiff's prima facie case in *Ortiz*. *See* 834 F.3d at 765–66; *see also David v. Bd. of Trs. of Cmty. Coll. Dist. No. 508*, 846 F.3d 216, 224 (7th Cir. 2017). Rejecting its own earlier approach (but remaining totally consistent with *McDonnell Douglas*), the Seventh Circuit instructed courts to ask simply "whether the evidence would permit a reasonable factfinder to conclude" that a "proscribed factor" caused the adverse employment action. *Ortiz*, 834 F.3d at 765.[4]

Accordingly, courts in this circuit addressing discrimination claims now conduct the traditional, four-pronged indirect analysis if the parties present arguments "in those terms," but also assess the evidence "cumulatively" to determine whether a jury could find that the challenged employment action was attributable to a proscribed factor. *David*, 846 F.3d at 224. Here, Plaintiff pursues his age discrimination claim using the old, indirect method of proof. *See* [34] at 9. Thus, this Court evaluates his claim under that method before considering the evidence cumulatively to answer the *Ortiz* inquiry. *See David*, 846 F.3d at 224; *Brown v. DS Servs. of Am.*, 246 F. Supp. 3d 1206, 1216–18 (N.D. Ill. 2017); *Mirocha v. Palos Cmty. Hosp.*, 240 F. Supp. 3d 822, 837–38 (N.D. Ill. 2017); *Wyman v. Evgeros, Inc.*, No. 15-c-2758, 2017 WL 386651, at *3 (N.D. Ill. Jan. 27, 2017).

---

[4] Indeed, the court could hardly have been clearer in its intent to eliminate the "blurred" distinction between the direct and indirect methods of proof. *Ortiz*, 834 F.3d at 765 ("Why have two tests if they consider the same information and answer the same question?"). Some of the attendant confusion likely arises from the fact that the three-step *McDonnell Douglas* framework is sometimes called the "indirect method" of proving employment discrimination—but the *Ortiz* court expressly noted that its decision affected the Seventh Circuit's "indirect method" of establishing a prima facie case, *not* the burden-shifting framework as a whole (as it was not, of course, within the appellate court's power to overturn a framework established by the Supreme Court). *See id*. at 766.

### 1. Indirect Method

Defendant contends that Plaintiff fails to establish a prima facie case of age discrimination because the events Plaintiff challenges are not actionable adverse actions and because Plaintiff fails to identify a younger, similarly-situated employee that Defendant treated more favorably. *See* [25] at 19.

#### a) *Adverse Actions*

An adverse employment action "significantly alters the terms and conditions of the employee's job," and a mere "inconvenience or a change in job responsibilities" cannot qualify. *See Griffin v. Potter*, 356 F.3d 824, 829 (7th Cir. 2004). Courts look for some "tangible job consequence" or a significant change in employment status. *Lucas v. Chi. Transit Auth.*, 367 F.3d 714, 731 (7th Cir. 2004); *Boss v. Castro*, 816 F.3d 910, 917 (2016).[5] Of the acts that Plaintiff complains of—and that occurred within the limitations period—this Court finds that his failure to secure a promotion, his failure to receive a bonus, Preusse's alleged threats, and Plaintiff's removal from the Power Outage Annex project do not constitute adverse actions.

As to Plaintiff's promotion to GS-13, Plaintiff received the only promotion he applied for within the limitations period governing his claim—that is, after August 2015. FEMA posted three GS-13 positions in July 2015. *See* [26] ¶ 54. Plaintiff applied for and was promoted to one of those positions in November 2015. *See id.* ¶¶ 56, 60. Obviously, receiving a promotion does not constitute an adverse action.

---

[5] This Court cites certain cases applying the indirect method in the Title VII context, since in that respect ADEA and Title VII claims require sufficiently similar analysis that this Court may rely on Title VII precedent to assess Plaintiff's ADEA claims. *See, e.g., Atanus v. Perry*, 520 F.3d 662, 672–73 (7th Cir. 2008) (assessing Title VII and ADEA claims together).

Plaintiff's failure to receive a promotion earlier falls outside the limitations period applicable to his claim.

Even if it did not, the record shows that Region V did not hire or promote any GS-13 program analysts in Plaintiff's branch during the period Plaintiff complains of (2013 to mid-2015). *See* [26] ¶¶ 20–22, 55. The branch lacked funding for a new GS-13 position until July 2015, and Plaintiff acknowledges that Wulfkuhle could not have unilaterally created such a position. *Id.* ¶ 20. The lack of an open position always provides "a legitimate reason" for refusing to promote an employee. *Jones v. City of Springfield*, 554 F.3d 669, 673 (7th Cir. 2009). Nor does Plaintiff provide any evidence connecting his lack of promotion to his age; he thus fails to show that age provided the determining factor in any of FEMA's hiring decisions—a necessary element of his claim under any method of proof. *See Gross*, 557 U.S. at 180; *Serwatka v. Rockwell Automation, Inc.*, 591 F.3d 957, 961 (7th Cir. 2010).

Likewise, Plaintiff's failure to receive a discretionary bonus does not constitute an adverse action as a matter of law. *Lewis v. City of Chicago*, 496 F.3d 645, 653 (7th Cir. 2007); *Miller v. Am. Family Mut. Ins. Co.*, 203 F.3d 997, 602 (7th Cir. 2001). Nor do Preusse's November 2015 threats: these ostensibly indicated that Plaintiff would not advance to GS-13, *see* [26] ¶¶ 57–58; [33-1] at 3; [26-2] at 466, and thus, if they were threats, they went unfulfilled when Plaintiff actually received his promotion that same month, *see* [26] ¶ 60. Unfulfilled threats that result in "no material harm" do not constitute adverse actions. *Ajayi v. Aramark Bus. Servs., Inc.*, 336 F.3d 520, 531 (7th Cir. 2003).

Plaintiff's removal from the Power Outage Annex project also fails to qualify as an adverse action. Transfers or reassignments may constitute adverse actions, but only if they entail a significant change in working conditions, a reduction in pay, or some other consequence resembling a demotion. *See Nichols v. S. Ill. Univ.-Edwardsville*, 510 F.3d 772, 780 (7th Cir. 2007). Even a transfer that diminishes an employee's opportunities for overtime and reduces her supervisory responsibilities reflects insufficiently severe consequences to constitute an adverse action. *See id.* at 780–81; *O'Neal v. City of Chicago*, 392 F.3d 909, 912–13 (7th Cir. 2004).

Here, Plaintiff's complaint amounts to the fact that he considered the Power Outage Annex project a "major" project that he was better equipped to manage than Geiger. *See* [26-2] at 57–59. Plaintiff also notes that he preferred to work on the Power Outage Annex project, and suggests that his removal from it affected his desk audit. *See* [33] ¶¶ 20–21. Plaintiff's subjective assessment of the prestige of a project cannot create an adverse action, nor does the denial of his personal preferences. *See Nichols*, 510 F.3d at 781. This Court discusses the desk audit next, but Plaintiff's implication that his removal from the Power Outage Annex project affected the audit finds no support in the record, which shows that Wulfkuhle removed Plaintiff from the project *two months after* the audit. *See* [26-2] at 328, 378; [26] ¶¶ 41, 48. Nor did this transfer affect Plaintiff's opportunity for advancement, since he was promoted barely a month later. *See* [26] ¶¶ 48, 60.

In short, Plaintiff's removal from the Power Outage Annex project—while remaining on at least three other projects and receiving no cut in pay—evinces none

of the negative consequences that demonstrate an actionable adverse action. *See* [26] ¶ 59; *Lewis*, 496 F.3d at 653; *Markel v. Bd. of Regents of Univ. of Wis. Sys.*, 276 F.3d 906, 911 (7th Cir. 2002) (removing plaintiff from specific accounts did not constitute adverse action).

Plaintiff's desk audit, by contrast, appears to qualify as the denial of a promotion, since it could have reclassified his GS-12 job as a GS-13 position. *See* [26] ¶¶ 38, 41. A failure to promote may constitute an adverse action, *see Lewis*, 496 F.3d at 653, so Plaintiff may use the desk audit to support his prima facie case. That does not save Plaintiff's claim, however, since he fails to identify any similarly situated employee that Defendant treated more favorably, as discussed next.

### b)     *Similarly Situated Employees*

Beyond the defects noted above, Plaintiff also fails to establish a prima facie case of discrimination because he does not identify a similarly situated employee that Defendant treated more favorably. *See Martino*, 574 F.3d at 453.

To survive summary judgment, a plaintiff must demonstrate that "at least one similarly situated employee, outside of their protected class, was treated more favorably than they were." *Alexander v. Casino Queen, Inc.*, 739 F.3d 972, 981 (7th Cir. 2014). A similarly situated employee must be "directly comparable" to the plaintiff "in all material respects." *Id.* (internal quotation marks omitted). The similarly-situated determination flows from a "common-sense" analysis of relevant factors, including whether the other employee "held the same position, had the same supervisor, was subject to the same standards, and engaged in similar conduct." *Id.* (internal quotation marks omitted). Courts also consider whether the

same decision-maker took the challenged actions. *See Ellis v. United Parcel Serv., Inc.*, 523 F.3d 823, 826 (7th Cir. 2008).

As to Plaintiff's alleged comparators, none help his cause. Holloway never worked in the same branch as Plaintiff or reported to the same supervisors. *See* [26] ¶ 67. Phillipson is approximately six years *older* than Plaintiff, and thus does not fall outside the protected class. *See id.* ¶¶ 3, 66. Even though Blum worked in Plaintiff's branch from 2013 to October 2014, he did not report to Wulfkuhle, FEMA funded his position from headquarters, and there is no evidence about his promotion or performance history to enable this Court to conclude that he received more favorable treatment. *See id.* ¶¶ 17–18, 21, 66.

Plaintiff claims that Cullen received more favorable treatment because he never had to take on IMAT duties, [33] ¶ 3, but Plaintiff fails to rebut Wulfkuhle's declaration that Cullen held a different collateral duty, *see* [39-1] at 25. In any event, Cullen is only about two years younger than Plaintiff and turned 40 in 2015, *see* [26] ¶ 66, which, absent evidence that Defendant specifically considered age in making IMAT assignments, weakens any inference of age discrimination. *See Bennington v. Caterpillar Inc.*, 275 F.3d 654, 659 (7th Cir. 2001). Further, Plaintiff offers no evidence as to Cullen's job responsibilities, performance history, or areas of expertise. The record reflects only that Cullen already held a GS-13 position by 2013, compared to Plaintiff's GS-12, which indicates that the two were not similarly situated. *See* [26] ¶ 19. As to Contreras and Castaldi, both received the GS-13 positions that Plaintiff applied for in 2014, *Id.* ¶ 51, but Plaintiff again offers

insufficient evidence to prove that they were similarly situated. Defendant's unrebutted evidence instead shows that FEMA did not hire Plaintiff for the position Contreras received because Plaintiff failed to meet the minimum required qualifications, and that FEMA selected Castaldi for the second GS-13 position because of his greater experience in mitigation. *See* [26] ¶¶ 50–52; [26-2] at 155.

A similar lack of evidence undermines Plaintiff's claim that Marsch was similarly situated—the record contains no evidence about Marsch's job duties, performance, qualifications, or conduct, except that he held a GS-13 position when he transferred out of the planning branch in 2013. *See* [26] ¶¶ 19, 21. That sparse record does not prove that Marsch was similarly situated to Plaintiff. In short, Plaintiff's failure to identify a similarly-situated employee dooms his discrimination claim. *See, e.g.*, *Jordan v. City of Gary*, 396 F.3d 825, 834 (7th Cir. 2005).

Finally, as to each of Defendant's challenged actions, Plaintiff offers no evidence tying those actions to his age. This, too, disposes of Plaintiff's claim, since ADEA plaintiffs must show that age provided the determining factor in the employer's decisionmaking. *See Gross*, 557 U.S. at 180; *Knapp v. Evgeros*, 205 F. Supp. 3d 946, 959 (N.D. Ill. 2016). In fact, Plaintiff offers zero evidence that age constituted a "but-for" cause of *any* of Defendant's allegedly adverse actions. *Gross*, 557 U.S. at 176. Plaintiff points to no comments directed at his age, no shift in treatment once he turned 40, no systematic preference for younger employees, and no other type of circumstantial evidence indicating discrimination. *See Vaughn v. CA Techs., Inc.*, 169 F. Supp. 3d 833, 840 (N.D. Ill. 2016).

Given this record, no reasonable jury could conclude that the employment actions Plaintiff challenges here are attributable to his age, *see Ortiz*, 834 F.3d at 765, and Defendant merits summary judgment on Plaintiff's age discrimination claim.

## C.    Retaliation

Plaintiff pursues his retaliation claim under the direct method of proof, [34] at 12, which requires him to show: (1) he engaged in statutorily protected activity; (2) he suffered an adverse employment action; and (3) there is a causal connection between the two. *See Smith v. Lafayette Bank & Trust Co.*, 674 F.3d 655, 657 (7th Cir. 2012). Plaintiff must also demonstrate that retaliation was the but-for cause of the adverse action. *See Barton v. Zimmer*, 662 F.3d 448, 455 (7th Cir. 2011).

Here, Plaintiff's protected activity consists of his February 2014 statement in support of Phillipson's age discrimination claim. *See* [26] ¶ 24. Defendant contends that Plaintiff cannot establish a causal connection between that protected activity and any allegedly adverse action because Plaintiff's supervisors did not know about Plaintiff's statement until much later. *See* [25] at 29; [26] ¶¶ 24–26.

The record shows that Plaintiff initially submitted his statement to Fairchild, an investigator contracted by FEMA. *See* [26] ¶ 25. Plaintiff testified that he did not send or distribute his statement to Wulfkuhle, Preusse, or anyone else in his department; he did, however, speculate that Odeshoo may have been aware of his statement. *See id.* ¶ 26; [26-2] at 34, 36. Wulfkuhle, Odeshoo, and Preusse stated that they did not know about the statement until Plaintiff filed his formal EEO complaint in 2016. *See* [26] ¶ 26; [26-2] at 93–94, 113, 141, 147. The only evidence

Plaintiff offers to contradict their account is the email Plaintiff sent Wulfkuhle on October 1, 2015, which referenced the fact that he had submitted a statement supporting Phillipson's discrimination claim. *See* [26] ¶ 61; [26-2] at 376–77.

In short, the record provides no evidence that Odeshoo, Preusse, Velasquez, or Pudlo knew about Plaintiff's statement before 2016; it shows only that Wulfkuhle knew about the statement as of October 1, 2015. If the supervisor taking the allegedly retaliatory employment action does not know about a plaintiff's protected activity, the plaintiff cannot establish a "causal link" between the challenged action and the protected activity. *Maarouf v. Walker Mfg. Co.*, 210 F.3d 750, 755 (7th Cir. 2000). Plaintiff's failure to establish that any of these supervisors knew about his protected activity thus disposes of his retaliation claim with respect to every challenged action except for those taken by Wulfkuhle after October 1, 2015.

Construing the record generously, that leaves only Plaintiff's failure to receive a bonus in 2015 or 2016. *See* [26] ¶¶ 14, 64. Wulfkuhle provided the performance reviews that resulted in Plaintiff's failure to receive a bonus in 2015 or 2016, *see* [26] ¶¶ 10, 12, 14, which may have taken place after he became aware of Plaintiff's support for Phillipson in October 2015. But the failure to receive a discretionary bonus does not constitute an adverse action in the retaliation context any more than in the discrimination context. *See Rabinovitz v. Pena*, 89 F.3d 482, 488–89 (7th Cir. 1996). Thus, this act cannot support Plaintiff's retaliation claim.

Even if it could, Plaintiff again fails to demonstrate any causal connection between Wulfkuhle's actions and Plaintiff's protected activity. The record does not

reflect any change in Wulfkuhle's conduct with respect to Plaintiff's bonus once he found out about Plaintiff's statement in October 2015—in fact, Plaintiff did not receive a bonus in 2014 either. *See* [26] ¶ 14; *Stutler*, 263 F.3d at 704 (lack of change in supervisor's behavior following protected activity undermined plaintiff's claim of a causal link). In fact, Wulfkuhle participated in the decision to promote Plaintiff to GS-13 a mere month after the October email referencing Plaintiff's statement. *See* [26] ¶¶ 56–60; [26-2] at 376–77.

Overall, Plaintiff offers no evidence beyond speculation linking his bonus to his statement in support of Phillipson. Such speculation is not evidence, *see, e.g.*, *Boss*, 816 F.3d at 919, and Plaintiff's retaliation claim requires "evidence of adverse employment actions linked to a protected activity, not just evidence of problematic hostility," *Hutt v. AbbVie Prod. LLC*, 757 F.3d 687, 694 (7th Cir. 2014). As it is, no reasonable jury could find that Plaintiff's statement motivated Defendant's challenged conduct, and this Court grants Defendant summary judgment on Plaintiff's retaliation claim.

## IV. Conclusion

For the reasons explained above, this Court grants Defendant's motion for summary judgment [24]. Judgment is entered in favor of Defendant and against Plaintiff. Civil case terminated.

Dated: June 26, 2018

Entered:

John Robert Blakey
United States District Judge